IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROCK RIVER HEALTH CARE, LLC, *et al.*, | |
| Plaintiffs, | Case No. 18-CV-06532 |
| v. | |
| THERESA EAGLESON, in her Official capacity as the Director of the Illinois Department of Healthcare and Family Services, | Judge John Robert Blakey |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Rock River Health Care, LLC, International Nursing & Rehab Center, LLC, d/b/a Aperion Care International, and Island City Rehabilitation Center LLC, d/b/a Aperion Care Wilmington (collectively, "Plaintiffs" or the "Providers") claim that Defendant Theresa Eagleson, in her capacity as the Director of the Illinois Department of Healthcare and Family Services, violated 18 U.S.C. § 1983 by failing to provide Plaintiffs due process during the audits that resulted in a recalculation of their Medicaid reimbursement rates. Before the Court are the parties' cross-motions for summary judgment, [61], [84]. For the reasons explained below, the Court denies both motions.

1

I.   **Background**[1]

Plaintiffs are nursing facilities that receive reimbursement for certain services covered by the Illinois Medicaid program. [88] ¶ 1.

A.   **Medicaid Reimbursement Rate Calculation**

The Illinois Department of Healthcare and Family Services ("HFS") calculates nursing facilities' reimbursement rates under the federal Medicaid laws. [98] ¶ 2. To calculate the reimbursement rates for services covered by Medicaid, nursing facilities provide certain information to HFS in the form of Minimum Data Sets ("MDS") assessments. *Id.* The MDS assessments capture information about a patient's comorbidities, their physical, psychological, and psychosocial function, and any treatments or therapies they receive. *Id.* ¶ 3. The MDS assessment involves a comprehensive, standardized assessment of each resident. *Id.*

After facilities submit these MDS assessments to HFS, HFS uses the MDS assessments and MDS Codes to identify residents' nursing and therapy needs. *Id.* ¶ 4. The U.S. Department of Health and Human Services' Center for Medicare and Medicaid Services ("CMS") provides resources to facilities regarding MDS Codes and how they relate to MDS assessments. *Id.* ¶ 6. HFS uses these MDS Codes to classify residents into resource utilization groups (RUGs), which determine the amount the facility receives for providing care to that resident. *Id.*

---

[1] The Court draws the background facts from the parties' statements of material facts, responses thereto, and cited records. [311]; [353]; [354]. The Court also takes judicial notice of the Illinois statutes and regulations regarding HFS reimbursement calculations and audit procedures. *See Demos v. City of Indianapolis*, 302 F.3d 698, 706 (7th Cir. 2002).

### B. On-Site Audit Procedure

Because MDS data is self-reported by facilities to HFS, HFS employs a team of auditors to conduct reviews of the MDS data. *Id.* ¶ 8. These audits are confidential and are not announced to the facility ahead of time. [88] ¶ 4.

At the beginning of an on-site audit, HFS staff meets with the facility's staff to explain the audit processes and expectations. [98] ¶ 8. HFS then requests certain documentation from the facility to support the facility's self-reported MDS data. *Id.* ¶ 11. HFS staff review this documentation and provide the facility with a Documentation Reconciliation List ("DRL"), which identifies the MDS Codes for each patient that HFS could not validate using the records provided by the facility. *Id.* ¶ 22. HFS gives the facility 24 hours to respond and to provide HFS with any additional documentation that would support the MDS Code. *Id.*; [88] ¶ 22.

At the conclusion of the on-site audit, HFS holds an exit conference with facility staff, which is memorialized in an exit conference letter. [98] ¶¶ 14–15. HFS informs the facility that the audit is complete and that no additional documents may be submitted. *Id.* After the on-site review, HFS supervisory staff review the audit results. *Id.* ¶ 16.

Approximately 90 days after the audit, HFS sends the facility an Initial Decision Letter, identifying which residents' RUG groups it has reconsidered as a result of the audit. [88] ¶ 18. Facilities may appeal HFS's determination within 30 days of receiving the Initial Decision Letter. [88] ¶ 20. The facility must submit any appeal to the HFS Deputy Administrator for Long Term Care. *Id.* HFS notifies

facilities of their appellate rights in an Entrance Conference Worksheet, an Initial Decision Letter, and an Exit Letter. [88] ¶ 17. Facilities may not support an appeal with additional evidence that they did not provide to HFS during the on-site audit. [88] ¶17.

In 2016, HFS conducted on-site audits of Plaintiffs, during which it reviewed Plaintiffs' self-reported MDS assessments. [88] ¶ 3. Based upon the information gathered at the on-site audits, HFS remained unable to validate several MDS Codes in Plaintiffs' self-assessments. *Id.* ¶ 15. As a result, HFS reduced Plaintiffs' Medicaid reimbursement rates accordingly. *Id.* Plaintiffs administratively appealed many of these determinations in accordance with the appellate process described above. *Id.* ¶ 17.

### C. Procedural History

Plaintiffs filed their complaint on September 26, 2018, [1], which they amended on October 18, 2018, [4]. The amended complaint asserted claims for: (1) violation of substantive and procedural due process under the Fourteenth Amendment; (2) violation of § 1396a(a)(13)(A), which provides for a public process for determining rates of payment; (3) declaratory relief under §§ 1983 and 1988; and (4) violation of the Administrative Procedure Act.

On April 5 and 8, 2018, Defendants moved to dismiss the amended complaint, [15], [18], and on August 12, 2019, the Court granted Defendants' motions. [28]. Plaintiffs appealed the Court's ruling on the procedural due process claim in Count I

4

on September 11, 2019. The Seventh Circuit reversed on Plaintiffs' procedural due process claim and remanded the case for further proceedings on October 4, 2021. [28].

On remand, Plaintiffs moved for summary judgment on the remaining claim, [61], and Defendants cross moved for summary judgment, [84]. This Court now resolves both motions.

## II. Legal Standard

A motion for summary judgment can be granted only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The motion will be granted only if, viewing the record in the light most favorable to the nonmoving party, no jury could reasonably find in the nonmoving party's favor. *McDonald v. Hardy*, 821 F.3d 882, 888 (7th Cir. 2016).

The nonmovant, though, "must do more than raise a metaphysical doubt as to the materials facts. Rather, she must come forward with specific facts showing that there is a *genuine issue for trial*." *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000) (citation omitted). In a case involving cross-motions for summary judgment, the Court construes "all inferences in favor of the party against whom the motion under consideration is made." *Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004).

### III. Analysis

Plaintiffs move for summary judgment, arguing that the record demonstrates as a matter of law that their due process rights were violated in connection with the MDS audit and recalculation process because: (1) the HFS auditors failed to explain why the documentation Plaintiffs provided for each identified MDS Code was deficient; (2) the HFS auditors considered evidence not provided by Plaintiffs during the audit, including the auditors' own observations and credibility determinations; and (3) Plaintiffs did not have a meaningful right to appeal HFS's determination. In their cross motion, Defendants contend that, not only was there no due process violation, but that, even if there was such a violation, the availability of an adequate post-deprivation remedy forecloses Plaintiffs' due process claim.

### A. Procedural Due Process

Courts apply a two-step analysis to determine whether a defendant deprived a plaintiff of his federal due process rights. *Isby v. Brown*, 856 F.3d 508, 524 (7th Cir. 2017). First, the Court must determine "whether the plaintiff was deprived of a property interest." *Id.* Then, if the plaintiff was deprived of a property interest, the Court must determine what process he was due. *Id.*

The Seventh Circuit has already held that the Providers in this case have a property interest in "a rate determined according to" the formula outlined in the Illinois Medicare statute based upon the Minimum Data Sets they submitted to HFS. *Rock River Health Care, LLC v. Eagleson*, 14 F.4th 768, 776 (7th Cir. 2021). Because the parties do not contest the deprivation of a legitimate property interest, the Court turns to the second part of the analysis.

1.  MDS Audit and Recalculation Process

Plaintiffs argue that Defendant's decision to decrease their reimbursement rate violated Plaintiffs' due process rights by considering evidence not provided by the Providers, failing to share all the evidence the auditors relied upon to compile the DRLs, and failing to explain why the documentation provided for each MDS Code identified in the DRLs remained deficient.

At the outset of an audit, providers "are required to submit the Minimum Data Set information to the Department" and "maintain documentation sufficient to support those determinations." *Id.* at 777. Thus, providers are "aware of the documentation that is required to support the rates" they submit to HFS. *Id.*

As the Seventh Circuit acknowledged, if "the auditors were entrusted solely with examining those records, and determining whether the documentation submitted by the Providers supported the reimbursement rates as a matter of law," there would be no due process concerns because the Providers would have received "notice of the patients for whom the evidence was questioned and the legal standards that had to be met, an opportunity to provide any evidence supporting their claim, and an opportunity to challenge on appeal the legal determination made by the auditors." *Id.* at 777−78.

The due process concern arises only when the auditors also "gather evidence" and "base their decision on their own credibility assessments and factual findings from that evidence." *Id.* at 778. In those situations, the Providers "are not made aware of the evidence against them before the decision is made to recalculate the

7

reimbursement rates." *Id.* Thus, they have no "opportunity to respond to new evidence gathered by the auditors" or to "address all of the facts upon which the recalculation is based." *Id.* Such a scenario violates due process.

Plaintiffs argue that, at each of their audits, the auditors did consider evidence outside of the documentation provided by the Providers, including the auditors' own observations and credibility determinations. Plaintiffs rely primarily upon comments written on Individual RUG Worksheets, which are labeled "Internal Use Only" and are not shared with the facility. [88] ¶ 24. These Individual RUG Worksheets included comments that, according to Plaintiffs, demonstrate that the auditors relied upon evidence other than the documentation the Providers furnished to the facilities, such as credibility determinations and observations. These comments include:

- "All data entries, hand printed names and initials appear to be written by the same person." [101] ¶ 21.
- "The ADL tracking sheet has handwritten names and initials by the same person. When comparing the CAN schedule for Days, Evenings and Nights, the staff scheduled to work conflicts with the off days and shifts. SS – does not work evenings or nights. PH – does not work days. LV – was off on 8/18. SR – was off 8/20 – Not validated." [88] ¶ 29.
- "ADL tracking documentation presented had all handwritten codes, staff initials and printed names appear to be written by the same person. Not validated." [88] ¶ 31.

8

- "During interview with resident, resident was sitting on a wheel chair [sic] and cannot communicate effectively with reviewer. Resident answered 'yes' to every question…Head of bed was not elevated and there was 1 pillow on head of bed." [97] at 12.

These comments contained in Individual RUG Worksheets indicate that auditors engaged in "observation and interviews of residents, families and/or staff" and made determinations regarding "the accuracy of data relevant to the determination of reimbursement rates." *Rock River*, 14 F.4th at 778.

Defendant argues that HFS does not base its audit decisions upon any observations made in the comment section of the Individual RUG Worksheet, citing the sworn declaration of Ms. Dawn Wells, a Senior Public Service Administrator with HFS who reviewed HFS's findings for the MDS reviews of Plaintiffs. [87-1]. In her affidavit, Ms. Wells stated that the findings for each of the three Plaintiffs "were based entirely on information provided by these facilities" and "were not based on any credibility determinations made by HFS's audit team or anyone else." *Id.* ¶¶ 17–18.

But on a motion for summary judgment, the Court must draw all reasonable inferences in the non-movant's favor. Plaintiffs have provided evidence that auditors made comments on Individual RUG Worksheets that demonstrate they, at the very least, observed and interviewed staff and residents, and made determinations regarding the credibility or accuracy of the data the Providers submitted. Further, the Internal RUG Worksheets state that "THE REASON FOR DENIAL MUST BE DOCUMENTED ON THE COMMENT SHEET FOR ALL AREAS" and the comments

9

section in question is called "RUGS VALIDATION COMMENTS ATTACHMENT." [67-1]. This evidence suffices to create a material factual dispute as to whether the auditors, as part of their review, considered evidence outside of the documentation provided to HFS by the Providers.

Defendant also argues that it provided more due process than required because it provided Plaintiffs with Document Reconciliation Lists, identifying each MDS Code in dispute and allowing Plaintiffs the opportunity to disclose additional documentation to validate each code. Defendant is correct that, had the auditors only considered the documentation the Providers supplied, the DRLs were not necessary to satisfy federal due process. *Rock River*, 14 F.4th at 777. But as discussed above, there is a factual dispute as to what evidence the auditors considered. Without knowing what evidence HFS actually used in making its decision, the Court cannot determine whether the Providers had "the opportunity to be presented with the evidence against" them and "an opportunity to respond." *Id.* at 778.

Because a factual dispute remains as to what evidence HFS considered as part of its determination to invalidate certain MDS Codes, the Court denies the parties' cross-motions for summary judgment on this basis.

### 2. Notice and Right to Appeal

Plaintiffs also move for summary judgment on the grounds that the appeal process available to them did not satisfy due process. Plaintiffs argue that an appeal to the HFS Bureau of Long Term Care was "not likely to be neutral" because the

10

reviewers belonged to the same department as the on-site auditors and would "have a bias towards an on-site reviewer" because they are "on the same side." [95] ¶ 38.

Plaintiffs' claims lack evidentiary support and run contrary to established case law. Those "serving as adjudicators" remain entitled to a rebuttable presumption "of honesty and integrity." *Amundsen v. Chicago Park Dist.*, 218 F.3d 712, 716 (7th Cir. 2000) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47, (1975)). To overcome this presumption, Plaintiff must demonstrate a "conflict of interest or some other specific reason for disqualification," such as "a pecuniary interest in the outcome." *Id.* Absent evidence to support a claim of bias, a review by an adjudicator who works in the same department as the initial reviewer does not violate federal due process. *Id.*

Plaintiffs have failed to provide any evidence of bias or a conflict of interest other than unsubstantiated conclusions that an adjudicator from the same department "is likely to come into contact with, and risk facing the displeasure of, the person whose determination he or she is tasked to review" and "there may be an unspoken understanding within the department to review others with a light touch" because they are "on the same side." [95] ¶ 38. These types of speculative statements, unsupported by any facts, are not only inappropriate on summary judgment, but are also insufficient to overcome the presumption of impartiality. *See Amundsen*, 218 F.3d at 716.

The Court denies Plaintiffs' motion for summary judgment on these grounds.

### B. Sufficiency of Post-Deprivation Remedy

Defendant argues that it is entitled to summary judgment because the existence of a post-deprivation remedy precludes Plaintiffs claim, even if its process for recalculating Plaintiffs' reimbursement rates violates due process.

To determine whether a specific process satisfies federal due process, courts distinguish "between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees." *Leavell v. Illinois Dept. of Natural Resources*, 600 F.3d 798, 805 (7th Cir. 2010) (quoting *Rivera-Powell v. New York City Bd. Of Elections*, 470 F.3d 458, 465 (2d Cir. 2006)).

If the "conduct in question is random and unauthorized, the state satisfies procedural due process requirements so long as it provides a meaningful post-deprivation remedy." *Id.* Defendant argues that any deviation from the Illinois regulations governing MDS reviews would necessarily be random and unauthorized. [85] at 35. Thus, if Plaintiffs had access to an adequate post-deprivation remedy, their due process claim would fail. According to Defendant, Plaintiffs do have such a remedy because they could have filed a common law writ of *certiorari* in state court.

But, as discussed above, a post-deprivation remedy (such as a writ of *certiorari*) only defeats a due process claim if the act underlying the deprivation was "random and unauthorized," and it is not clear from the record that the HFS auditors deviated from Illinois regulations. The parties agree that the HFS auditors provided their preliminary conclusions to the Plaintiffs in the DRLs, [88] ¶¶ 22, 33, 71, 80, and Defendant points to no regulation that requires HFS to provide additional

12

information beyond that contained in the DRLs. Thus, HFS may have provided its preliminary conclusions to Plaintiffs in accordance with HFS regulations, yet still violated Plaintiffs' right to due process by failing to inform Plaintiffs of any extraneous evidence it considered in making those preliminary conclusions.

Because Defendant has not established that the auditors' actions were unauthorized and random, any post-deprivation remedy available to Plaintiffs is insufficient to defeat their due process claim at this stage.

### C.    Eleventh Amendment Immunity

Defendant also argues that Plaintiffs' claims are barred by the Eleventh Amendment to the extent they seek any relief other than prospective injunctive relief. Plaintiffs concede that they are only entitled to prospective injunctive relief, in addition to any attorneys' fees and costs to which they may be entitled. *See Pulliam v. Allen*, 466 U.S. 522, 543 (1984). Because Plaintiff only seeks prospective injunctive relief (and related fees and costs), the Eleventh Amendment does not bar their claims. *Id.*

## IV. Conclusion

For the reasons explained above, the Court denies the parties' cross-motions for summary judgment, [61] and [84]. The Court orders the parties to submit a joint status report on or before April 15, 2024, proposing additional case management dates, including potential trial dates in 2025 (as well as the expected length of trial).

Dated: March 26, 2024

                                    Entered:

                                    _____
                                    John Robert Blakey
                                    United States District Judge